**ASSOCIATED RANDALL BANK,
Plaintiff–Appellant,**

v.

**GRIFFIN, KUBIK, STEPHENS &
THOMPSON, INC., Defendant–
Appellee.**

No. 92–2684.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1993.

Decided Aug. 19, 1993.

Donald K. Schott, Erica M. Eisinger (argued), Quarles & Brady, Madison, WI, for plaintiff-appellant.

Linda M. Zech, DeWitt, Porter, Huggett, Schumacher & Morgan, Madison, WI, Ronald P. Kane (argued), Michael A. Kraft, Diane C. Fischer, Siegan, Barbakoff & Gomberg, Chicago, IL, for defendant-appellee.

Before EASTERBROOK and ROVNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Associated Randall Bank, a financial institution chartered by Wisconsin, frequently invested in bonds issued by state and local governments. Between the mid 1970s and 1987 it relied on advice furnished by James Kubik. Since 1980 Kubik has been a principal of Griffin, Kubik, Stephens & Thompson, Inc., a broker-dealer specializing in municipal securities. Although James Fiore, the Bank's president, retained ultimate authority over investment decisions, he accepted most of Kubik's recommendations. Late in 1986 Kubik recommended, and the Bank purchased, securities nominally issued by Memphis and Louisiana. Since 1991 these bonds have been in default, and the Bank wants Griffin Kubik to make good the investment. Suing under the diversity jurisdiction, the Bank has invoked the common law of Wisconsin. (The federal securities laws do not apply to most governmental securities. 15 U.S.C. §§ 77c(a)(2), 78c(a)(12)(A)(i), (ii), (29), (42).) The posture of the case leads us to state the facts and inferences favorably to the Bank, with the usual caution that a trial may put things in a different light.

Kubik recommended both the Memphis and Louisiana bonds. Kubik told Fiore that the Memphis bonds were "not unlike" municipal bonds the Bank had purchased before. "Not unlike" can mean almost anything; although the listener may cancel the negatives to obtain "like," the author may want to convey some difference between "like" and "not unlike." Speakers and writers alike would do well to heed the advice: "Beware the unappealing trick of *not un____*, a kind of litotes that convolutes lawyers' language. Swear off using it by saying to yourself, 'A not unblack dog was chasing a not unsmall rabbit across a not ungreen field.'" Bryan A. Garner, *The Elements of Legal Style* 155 (1991), quoting from George Orwell, *Politics and the English Language*, in 4 *Collected Essays, Journalism and Letters of George Orwell* 127, 138 (1968). Kubik had not brushed up on his Orwell and may have to pay dearly.

The Bank had been purchasing bonds that would be repaid from the income of housing (a common place for banks to reinvest depositors' capital), and Fiore was willing to buy more. Fiore understood Kubik to say that the proceeds of the Memphis bonds were designed to finance investment in low and moderate income housing. Kubik concedes that this is what he meant, which makes it a statement of "fact" for purposes of Wisconsin's law so long as it is understood as a representation about the documents in existence rather than a prediction about how things would turn out. Compare *Radford v. J.J.B. Enterprises, Ltd.*, 163 Wis.2d 534, 544, 472 N.W.2d 790, 794 (App.1991), with *Consolidated Papers, Inc. v. Dorr–Oliver, Inc.*, 153 Wis.2d 589, 594, 451 N.W.2d 456, 459 (App. 1989). The only caution Kubik offered was that income from the Memphis bonds would be taxable. The Bank bought $250,000 of the Memphis bonds and an equal amount of the Louisiana bonds, which Kubik said were "similar" to the Memphis instruments. According to the Bank, the statement that proceeds of the Memphis and Louisiana bonds would be invested in housing (or agricultural projects, in Louisiana's case) was a negligent misrepresentation. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis.2d 127, 377 N.W.2d 605 (1985); *Whipp v. Iverson*, 43 Wis.2d 166, 169–70, 168 N.W.2d

201, 203–04 (1969). The proceeds were invested not in housing or agriculture but indirectly in a portfolio of convertible subordinated corporate debentures—high-yield, high-risk instruments commonly known as "junk bonds." When the risks came to pass, owners of the Memphis and Louisiana bonds were left holding the bag.

The Memphis and Louisiana securities were among eight similar packages underwritten by Drexel Burnham Lambert Incorporated and guaranteed by Executive Life Insurance Company. The proceeds of the offering ($400 million for the Memphis bonds, $150 million for the Louisiana bonds) were sent to Executive Life, which issued "guaranteed investment contracts" to the public authorities. Executive Life then reinvested the proceeds in a portfolio of high-yield instruments offered by Drexel Burnham. It used the income from these instruments to pay the interest on its obligations to the eight state and local governments. Executive Life pledged its capital surplus, about $184 million, to guarantee its commitments. This arrangement was safe so long as the portfolio of "junk bonds" performed well. Standard & Poor's gave the Memphis and Louisiana bonds an AAA rating and held Executive Life in the same high regard. But a downturn in the economy or hostility from governmental regulators could hurt this market in volatile instruments. In the event, the portfolio was affected by both a downturn and public hostility. Standard & Poor's downgraded the bonds to A in February 1990 and to BBB in April 1990. Executive Life failed and was placed in conservatorship in April 1991. State regulators have taken the position that the guaranteed investment contracts are not insurance and so come behind policyholders' claims in priority. The Memphis and Louisiana bonds accordingly are in default.

What then of the stated uses of the bonds' proceeds—housing for Memphis, agriculture for Louisiana? None of the indentures specified that the state or municipal officials had to invest all, or even any, of the proceeds in public projects, and there was no time limit for making such investments. To finance any of their projects, the state and local

officials had to borrow against the guaranteed investment contracts. The amount that could be borrowed in any year was limited, the rate of interest charged was high, the agency had to pay a fee for each advance, and the loans had to be well secured with repurchase obligations. These terms induced the public agencies to leave all of the funds with Executive Life. A trade publication ran a series of articles in the fall of 1986 pointing out these unusual features of the securities, relaying criticism of S & P's AAA rating (Moody's had given the bonds a lower rating), and observing that the terms on which the public authorities could obtain any of the proceeds implied that "the bonds [have been] sold only to earn arbitrage and not to perform a public purpose, such as making loans for multifamily housing and agriculture and industrial development." George Yacik, "S & P to Uphold AAA Rating of Executive Life Claims Paying," *The Bond Buyer* (Oct. 29, 1986). In other words, junk bonds were paying rates of interest in excess of state and local governments' cost of capital. Public authorities therefore could raise money to invest in junk bonds, earning a profit on the difference in interest rates. To the extent investors saw what was going on, the public authorities had to pay higher interest rates, so the arbitrage profit was limited. A headline in *The Bond Buyer* of November 6, 1986, ran: "Taxable Munis Backed by AAA–Rated GICs Trade at Yields Equal to BBB Corporates." The article added that the bonds "are currently trading at yields anywhere between 140 and 165 basis points above the yield on 10–year Treasury notes—about the same spreads on corporate bonds rated BBB." So the market was not fooled, although perhaps the initial purchasers paid too much, only to see the price fall in the secondary market to assure these higher yields.

Kubik held himself out as an expert in municipal bonds, and his firm once informed the Bank that it was dealing in securities "with the greatest degree of complexity and credit nuance amongst fixed income vehicles, mandating expert guidance in the field." Although Griffin Kubik subscribed to *The Bond Buyer* and similar publications, Kubik does not recall reading in them any suggestion

that the Memphis and Louisiana bonds were unusual. He recommended them to Fiore largely on the strength of the AAA rating and their high yields. Fiore bought them on the same basis. The Bank received the offering circular for the Memphis bonds after agreeing to buy them but before settlement; it received the offering circular for the Louisiana bonds after settlement. In each case the Bank gave the circular a cursory review and salted the bonds away. In 1987 the Bank began receiving investment advice exclusively from a subsidiary of an affiliated bank; satisfied with the AAA rating, the new investment adviser did not suggest selling the bonds. The Bank was still holding them when the default occurred—although Kubik had informed the Bank about the downgradings to A and BBB in 1990.

The district court dismissed under Fed. R.Civ.P. 12(b)(6) the Bank's argument that Griffin Kubik could be liable for selling securities that were "unsuitable" to the Bank's investment objectives. Later it granted summary judgment on the claims of negligent misrepresentation. (There were two flavors: negligence and strict responsibility for misrepresentation. For current purposes these torts have the same elements, so we refer only to negligence.) Griffin Kubik prevailed because the key "not unlike" statement was true: the Memphis bonds *were* for the purpose of housing loans. So the offering circular said. For the district court, that was that. Hindsight (the fact that no housing loans were ever made) cannot produce retroactive misrepresentation; Griffin Kubik was entitled to inform the Bank about conditions as they appeared in September 1986. The contemporaneous articles in *The Bond Buyer* and similar publications, the district court thought, were inadmissible hearsay and "speculative" to boot.

Like the district court, we believe that things must be assessed as they appeared in the fall of 1986. How matters turned out is neither here nor there. *Pommer v. Medtest Corp.,* 961 F.2d 620, 623 (7th Cir.1992); *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 518 (7th Cir.1989); *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 440–41 (7th Cir. 1987); *Escott v. BarChris Construction*

*Corp.,* 283 F.Supp. 643, 669–70, 675 (S.D.N.Y. 1968). Unlike the district court, however, we do not dismiss the contemporaneous publications as "speculative." The best way to appreciate how things appeared to a specialist such as Kubik in the fall of 1986—or should have appeared to him, had he been exercising due care—is to see how they appeared to *other* specialists at the same time. Kubik was selling advice informed by expertise. A specialist takes precautions such as reading the trade press. Kubik subscribed to these journals and, he testified at his deposition, read them occasionally. They are not comic books or the work of astrologers, and they are no more "speculative" than any other effort to interpret complex financial documents. A report that these municipal bonds had the same rate of return as BBB corporates is not "speculation" of any kind, and to an expert it should have spoken loudly. Offered to show what other experts knew and were thinking, the articles also are not hearsay. That is, the Bank did not use the publications to show that Memphis was in fact engaged in interest rate arbitrage, but to show that a person such as Kubik offering expert advice (and charging accordingly) should have been aware that these bonds were not plain vanilla offerings.

A jury could infer that Kubik led Fiore to believe that the Memphis and Louisiana bonds were ordinary governmental securities, to be backed by mortgages on the properties being financed with the proceeds. Mortgage-backed securities have lower default rates than corporate debentures—especially the high-yield junk bonds that were effectively equity investments that had been structured for tax purposes to pay interest rather than dividends. To put this differently, a jury might believe that the Bank thought it was investing in *bonds* (with the security interest that name implies) when it was obtaining only an indirect interest in a pool of equity investments. The difference was material by any standard. A jury also might infer that a specialist in the exercise of due care would have realized this, just as the trade press did—indeed, just as that aggregate of investors called "the market" did in bidding down the price of these bonds until their rate of return matched that of BBB

corporate instruments. An indenture that requires the issuer to turn 100% of the proceeds over to a third party, and then provides that the issuer may borrow the money back at a rate of interest exceeding what the issuer would pay for fresh money in the market, is in fact a funding device for the third party rather than the issuer. A reasonable jury could conclude that these bonds were mechanisms by which Executive Life raised money to invest in corporate debentures, rather than mechanisms by which Memphis and Louisiana raised money for public projects—and that a careful expert in this field would have realized it.

Kubik reminds us that his firm sent the offering circulars to the Bank, which after its own review went ahead with the transactions. This argument has some force (although only for the Memphis bonds; the papers for the Louisiana bonds arrived after the settlement, making them a classic "retrospectus"). A person offered a complete written description of the transaction and all its risks is hard put to say that a brief and ambiguous oral statement ("X is not unlike Y") was material misinformation. See *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 529–30 (7th Cir.1985); *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030–31 (9th Cir.1992); *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1518–19 (10th Cir.1983). Wisconsin requires the plaintiff to show that he relied on the misrepresentation, and having the truth at hand precludes reliance. "At hand" is a vital qualification. Information buried deep in a mound of obfuscatory language does not assist an investor. *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322, 1325 (7th Cir.1988); see *Virginia Bankshares, Inc. v. Sandberg*, —— U.S. ——, —— – ——, 111 S.Ct. 2749, 2760–61, 115 L.Ed.2d 929 (1991); *Associates in Adolescent Psychiatry, S.C. v. Home Life Insurance Co.*, 941 F.2d 561, 570–71 (7th Cir.1991). The trade press described these offering circulars as unusually opaque and pointed out that one investment bank had withdrawn from the Louisiana offering because it could not figure out what was going on. Kubik tells us that he was taken in. If a specialist in municipal bonds could not understand the difference between these instruments and ordinary mortgage-backed securities, it is hard to see how Fiore should have nosed out their peculiarities. Kubik was the *buyer's* agent, selling expert advice. A buyer of securities is entitled to be less wary of advice from his own agent than of information furnished by a seller.

The Bank's possession of the offering statements nonetheless knocks out one of its claims. The district court understood the Bank to be arguing that Wisconsin law entitles it to enforce Rule G–19 of the Municipal Securities Rulemaking Board, which requires dealers in municipal securities to recommend only such instruments as are suitable to their customers' needs. Holding that Wisconsin does not recognize a private right of action to enforce such rules, the district court dismissed this claim under Rule 12(b)(6). According to the Bank, however, its argument is a claim of negligence under Wisconsin law: Griffin Kubik should have recognized that a pool of high-risk, equity-like instruments was unsuitable for a bank. Federal securities law also requires brokers and dealers acting as agents to procure "suitable" securities. But federal law requires this only when the agents exercise discretion over the accounts. Customer-directed transactions fall outside the "suitability" requirement—especially if the agent provides the customer with a prospectus or comparable information. E.g., *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020 (2d Cir.1993). The Bank does not offer any reason to believe that Wisconsin law is different. A broker-dealer in Wisconsin is not a fiduciary with respect to accounts over which the customer has the final say, and in the absence of unusual circumstances owes its customer only a duty of ordinary care. *Merrill Lynch*, 127 Wis.2d at 133–37, 377 N.W.2d at 608–09. The Bank demanded, and exercised, the final say, rejecting at least 15% of Kubik's recommendations. Wisconsin therefore did not require Kubik to recommend only securities "suitable" to the Bank's portfolio; the Bank could decide for itself which instruments were appropriate. Of course Fiore would have trouble doing this while under the influence of misleading information; that is why the claim of negligent misrepresentations must proceed to trial.

Notice the limitation: "negligent misrepresentations." The Bank protests that Kubik not only misled it but also failed to supply vital information:

(1) Executive Life's heavy investment in junk bonds, (2) Executive Life's ties to Drexel Burnham Lambert, the same firm that acted as underwriter for the Memphis and Louisiana Bonds, (3) the lack of disclosure made with respect to the GIC Bonds, (4) indications by state insurance regulators that the Executive Life GICs would not be treated as insurance policies, and therefore assigned a lower priority if Executive Life were to experience financial difficulty, and (5) the significantly lower rating assigned to Executive Life by Moody's rating service.

Appellant's Brief at 22. This demand for additional information would impose on a broker-dealer a fiduciary obligation that, under Wisconsin law, it does not possess. A requirement of such detailed disclosure also would disrupt the way in which broker-dealers do business and substantially increase the costs of securities transactions. Brokers often put securities on "recommended" lists, calling customers with the news that such-and-such a stock or bond is a "good buy." A legal requirement to disclose all risk factors over the phone would make the transmission of information most costly. The upshot might well be the provision of less information. See *Morales v. Trans World Airlines, Inc.,* — U.S. —, —, 112 S.Ct. 2031, 2040, 119 L.Ed.2d 157 (1992). Whether the underwriters of these bonds should have found and disclosed the tidbits to which the Bank refers would be a close question. Broker-dealers have significantly lesser obligations under federal securities law. Their duty is to exercise "reasonable care," as distinct from the underwriters' duty of "reasonable investigation." See Comment, *"Reasonable Care" in Section 12(2) of the Securities Act of 1933,* 48 U.Chi.L.Rev. 372 (1981). Our opinion in *Sanders v. John Nuveen & Co.,* 619 F.2d 1222 (7th Cir.1980), cert. denied, 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981), suggests that the sole dealer and market maker in an issuer's commercial paper may be held to a higher standard, but the SEC condemned that view as erroneous—so plainly wrong, it told the Supreme Court, that further review would be a waste of time. See 450 U.S. at 1011, 101 S.Ct. at 1722 (Powell, J., dissenting from the denial of certiorari and quoting the Solicitor General's brief). That prediction has been confirmed: during the intervening decade neither this court nor any other has pursued the implication of *Sanders,* that broker-dealers must investigate the securities they sell. Whatever obligation state law may impose on sole dealers or exclusive market makers, as in *Sanders,* need not detain us; Griffin Kubik occupied no such status. Of the $2 billion raised by the eight GIC offerings, Griffin Kubik sold only about $20 million worth. Nothing we can see in Wisconsin law suggests that dealers must track down, and disclose over the phone, the sorts of information ordinarily located in the "risk factors" section of a prospectus. Liability in this case accordingly depends on what Kubik said and what that implied, rather than on an open-ended theory of an obligation to investigate and disclose the results. It may be that Griffin Kubik should have disclosed additional information to dispel the misleading character of the "not unlike" statement, but the broker-dealer was under no obligation to conduct an investigation to obtain such information.

One final subject merits a brief comment. Wisconsin requires the plaintiff in a misrepresentation case to demonstrate a causal link between the representation and the injury. *Whipp,* 43 Wis.2d at 170, 168 N.W.2d at 203; *Production Credit Ass'n v. Vodak,* 150 Wis.2d 294, 309–10, 441 N.W.2d 338, 344 (App.1989). The Bank's own theory is going to make this hard. For the Bank insists that "the market" knew about the risk—which is why the Memphis and Louisiana bonds carried interest rates appropriate for BBB corporate securities. The implication is that the Bank got exactly what it paid for. Perhaps the price fell somewhat after the Bank bought the bonds, as the market fully absorbed the information. But once the truth was out, known to sophisticated traders, the price of the securities would have reflected all risks. *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1115–16 (9th Cir. 1989); *Flamm v. Eberstadt,* 814 F.2d 1169,

1179–80 (7th Cir.1987). To put this somewhat differently, the fraud-on-the-market theory approved in *Basic, Inc. v. Levinson,* 485 U.S. 224, 241–47, 108 S.Ct. 978, 988–92, 99 L.Ed.2d 194 (1988), has a truth-on-the-market corollary.

Damages under § 10(b) of the Securities Exchange Act, the closest federal parallel to the state claim the Bank asserts, usually are the difference between the price of the stock and its value on the date of the transaction if the full truth were known. E.g., *Goldberg v. Household Bank, f.s.b.,* 890 F.2d 965, 966–67 (7th Cir.1989); *Pommer,* 961 F.2d at 628; *Jordan,* 815 F.2d at 441–43. Sometimes this principle comes under the name "loss causation": the plaintiff must establish that the misstatement caused him to incur the loss of which he complains; it is not enough to establish that the misrepresentation caused him to buy or sell the securities. E.g., *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 683–84 (7th Cir.1990). A decline in the junk bond market lies behind the Bank's loss, just as a decline in the oil market lay behind plaintiff's loss in *Bastian.* The Bank had opportunities to protect itself from this decline; it could have sold the bonds any time between 1986 and 1991. Instead it chose to retain them and accept the higher rate of return, with the attendant risk. It is far from clear to us that Wisconsin law transfers such risks back to broker-dealers. This subject must abide the decision on remand.

REVERSED AND REMANDED.