Ralph MAJESKI, Joseph Yach, Janice Waisman, Larry R. Peterson, Thomas Weil, Lee Aldridge, Randy Karpinsky, Kenneth Kulas, Robb S. Elliott, and Raymond Harding, Plaintiffs,

v.

BALCOR ENTERTAINMENT COMPANY, LTD., an Illinois corporation; Shearson Lehman Hutton, Inc., f/k/a Shearson Lehman Brothers, Inc., and f/k/a Shearson Lehman/American Express, Inc., a Delaware corporation; The Balcor Company, an Illinois corporation; Balcor/American Express Inc., an Illinois corporation; Balcor Securities Company, an Illinois corporation; The American Express Company, a New York corporation; New World Pictures, Ltd., a California corporation, and Balcor Film Investors, an Illinois Limited Partnership, Defendants.

Robert ECKSTEIN and Sylvia Eckstein, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

BALCOR FILM INVESTORS, Balcor Entertainment Company, The Balcor Company, The Balcor Securities Company, Jerry M. Reinsdorf, Robert A. Judelson, James E. Finley, Gregory S. Junkin, Barry R. Jackson, Joseph A. Kruszynski, New World Entertainment, Ltd., Lawrence L. Kuppin, Robert Rehme, and Harry E. Sloan, Defendants.

Civ. A. Nos. 88–C–1079, 89–C–1315.

United States District Court, E.D. Wisconsin.

Aug. 31, 1994.

Michael S. Glassman, Clemens, Glassman & Clemens, Los Angeles, CA, Robin F. Zwerling, Zwerling, Schachter & Zwerling, New York City, Jules Brody, Stull, Stull & Brody, New York City, for Robert and Sylvia Eckstein.

Steven L. Bashwiner, Mary Ellen Hennessy, Katten Muchin & Zavis, Chicago, IL, Ross Anderson, Frisch Dudek Ltd., Milwaukee, WI, Robert J. Walner, Gen. Counsel, The Balcor Co., Skokie, IL, for Balcor.

Cassandra S. Franklin, Hufstedler, Kaus & Ettinger, Los Angeles, CA, for New World Pictures, Ltd.

W. Stuart Parsons, Quarles & Brady, Milwaukee, WI, for Lawrence L. Kuppin, Robert Rehme, Harry E. Sloan.

George P. Kersten, Kersten & McKinnon, Milwaukee, WI, Jerry H. Friedland, Galanis & Friedland, S.C., Milwaukee, WI, for Ralph Majeski.

H. Nicholas Berberian, Neal Gerber & Eisenberg, Chicago, IL, Terry E. Mitchell, Mitchell, Baxter & Zieger, S.C., Milwaukee, WI, for American Exp. and Shearson Lehman.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

REYNOLDS, District Judge.

The two above-captioned securities class actions return to this court on remand from the Seventh Circuit for disposition of renewed summary judgment motions by the defendants against the respective plaintiff classes in both actions ("the Majeski Action" and "the Eckstein Action"). On March 11, 1992, this court dismissed both cases for having been brought outside the limitations periods. *Majeski v. Balcor Entertainment Co.*, 786 F.Supp. 1458 (E.D.Wis.1992). On appeal, the Seventh Circuit remanded the cases with instructions on both the merits of the cases and the application of the limitations periods. *Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994).

On remand the plaintiff classes moved to amend their complaints and the two groups of defendants each moved for summary judgment against the respective plaintiff classes. This court granted the Eckstein class motion to amend, and held hearings on the two summary judgment motions and also on the Majeski plaintiffs' motion to amend their complaint to add a Racketeering Influenced Corrupt Organizations Act ("RICO") count. For the reasons explained below, this court finds that it must once again grant summary judgment against both the Majeski and Eckstein plaintiffs. The court also denies the Majeski motion to bring RICO claims against the defendants to their action, and dismisses the pendent state law claims, thus disposing of these cases.

## I. FACTUAL BACKGROUND

In recounting the facts, the court assumes familiarity with the Seventh Circuit decision in these cases.

### A. THE OFFERINGS

#### 1. The Initial Offering

In 1985, the Balcor/Shearson/American Express defendants organized a partnership, called Balcor Film Investors ("BFI"), in order to fund the development, production, acquisition and distribution of movies in a joint venture with New World motion picture com-

pany. Balcor/American Express (owned by Shearson/American Express—in turn owned by American Express) created Balcor Entertainment to become the general partner of the newly created BFI. An initial public offering began with a January 1985 prospectus offering BFI limited partnership interests ("Interests") over-the-counter to investors. Under the terms of the January 1985 prospectus, if Balcor Entertainment received $50 million worth of subscriptions (50,000 subscriptions at $1000 a piece) for Interests within nine months, then the subscriptions would turn into the Interests. If the offering raised less than $50 million, then it would fail, no Interests would be sold, and subscribers would get their money back. (Jan. 8, 1985 Prospectus at 2.[1])

The January 1985 prospectus specifically and repeatedly warned investors that the movie industry was a risky business (many of the warnings were quoted at length in this court's previous opinion). See Majeski, 786 F.Supp. at 1462–64. The prospectus also cautioned that under BFI's agreement with New World, New World would retain a substantial amount of discretion regarding the development, acquisition, production and distribution of BFI films. (Jan. 8, 1985 Prospectus at 6, 28–29.) Further, the prospectus admonished that BFI would be "dependent upon the overall financial performance of all aspects of New World's operations," and that should New World become insolvent, BFI would not be able to extract monies owed. (Id. at 6.)

The January 1985 prospectus concentrated a great deal on the terms of the production agreement between BFI and New World, for this agreement formed the basis of BFI's operations. (Id. at 1, 4, 6, 13–16, 18, 20–24, 26, 28–29, 35.) Instead of including a copy of the 116–page production agreement, however, the January 1985 prospectus stated, under the heading "Business of the Partnership", that:

The Production Agreement is attached to the Registration Statement of which this Prospectus is a part and *all references to the Production Agreement in this Prospectus are qualified in their entirety by reference to the text thereof. Copies of the Production Agreement are available from the General Partner [Balcor Entertainment] upon request.*

(Jan. 8, 1985 Prospectus at 13) (emphasis added).

The January 1985 prospectus summarized many of the terms of the production agreement—in one section advising that New World would pay a royalty to BFI for home video rights in BFI pictures. (Id. at 20.) The plaintiffs assert that without ancillary markets, such as home video and television, New World's movies had rarely been profitable, but the prospectus failed to specifically disclose that New World was to keep a large share of the home video receipts, and to pay BFI a net license fee of 22.5% of the wholesale selling price of home videos sold. The plaintiffs allege that this split was disadvantageous to BFI, and that the prospectus and sales literature had led the investors who read them to believe that the prosperity and safety of their BFI investments would be partially dependent upon the bright future and risk reducing nature of home video market—a market which it appears from the agreement that New World, not BFI, was to profit the most from.

## 2. The Supplemental Offering

The initial prospectus did not sell enough Interests. By October 7, 1985, Balcor Entertainment had received and accepted only $32 million in subscriptions and had thus failed to meet its $50 million minimum. (Oct. 11, 1985 Supplement at 1.[2]) Instead of giving up and reimbursing investors, Balcor Entertainment amended the terms of the offering in a supplement to the prospectus dated October 11, 1985 ("the 1985 Supplement"). All subscribers were offered a refund, but could resubscribe under the terms of the October 1985

---

**1.** The Balcor Film Investors Prospectus dated January 8, 1985 is Exhibit A in Volume I of the Appendix to Defendants' Memorandum in Support of Motion for Summary Judgment in the Eckstein Action.

**2.** The October 11, 1985 Supplement to the January 8, 1985 Prospectus is Exhibit E in Volume II of the Appendix to Defendant's Memorandum in Support of Motion for Summary Judgment in the Eckstein Action.

Supplement, which incorporated the January 1985 Prospectus, but lowered the mandatory minimum sales goal to $35 million in Interests by December 31, 1985. Under the 1985 Supplemental offering, after $35 million had been received (including resubscriptions), all subscription funds were to be turned over to the BFI partnership for use in accordance with the terms of the offering. This effectively solidified the investments prior to the December 31, 1985 closing date if more than $35 million was pledged. The strategy worked, and by the end of October, nearly $40 million in subscriptions had been sold. (Harris Aff. ¶ 3(b).[3]) On December 31, 1985, after the Partnership raised over $48 million, the offering terminated. (*Id.* ¶ 4.)

The movies released by New World in the first half of 1985 were theatrical disasters. Allegedly, New World desperately needed the Balcor cash infusion simply to survive and pay off its debts. None of the offering materials or supplements made mention of these alleged facts. The 1985 Supplement also failed to mention that in September of 1985 (just one month before the second offering), Worldvision, which was a major source of pre-sales revenue for New World, had ceased making agreed-to payments to New World in a dispute which erupted into litigation in December of that year.

BFI supplied a tax advantage for the investors during the first two years and despite its lack of pay-off, apparently none of the investors suspected that anything was amiss. In May of 1987, BFI sent the investors a report that BFI had produced all of its films, but had a projected net loss of over $14 million. By August of 1987, all of the plaintiffs had received this report. In the summer of 1988, BFI told its investors that they would lose some of their capital. According to the investors, it was not until this disclosure—two to three months before filing this action—that their ears perked, and they discovered their claims. *See Eckstein*, 8 F.3d at 1129; *Majeski v. Balcor*, 740 F.Supp. 563, 566–67 (E.D.Wis.1990).

### B. THE LAWSUITS

#### 1. The Majeski Suit

The Majeski plaintiffs all reside in Wisconsin and bought their investments from Wisconsin brokers. These plaintiffs sought and retained counsel to pursue potential litigation in the summer and fall of 1988. (Defs.Prop.Findings of Fact ¶ 6; Majeski Pls.Response ¶ 5.) They filed their action on October 11, 1988.

The Majeski class asserts a standard § 10(b) and Rule 10b–5 fraud claim—that they invested in the BFI Interests in reliance on fraudulent misrepresentations and omissions of material facts in the offering materials. The three major spheres of fraud upon which the Majeski plaintiffs base their claims are that the defendants: (1) fraudulently omitted facts relating to the perilous financial health of New World and its dispute with Worldvision; (2) fraudulently omitted the fact that BFI was only going to receive 22.5% of the home video royalties; (3) fraudulently misrepresented the safety of the investment by understating the risks.

#### 2. The Eckstein Suit

The Eckstein plaintiffs represent those investors who failed to read the prospectus but contend that, but for fraudulent misrepresentations and omissions, the offering would have failed and they would have gotten their money back. The Eckstein plaintiffs filed their suit in California federal court in February of 1989, and the Panel on Multidistrict Litigation transferred the case to this court.

### II. ANALYSIS

#### A. MAJESKI ACTION

This court must resolve two motions in the Majeski action—the defendants' motion for summary judgment on statute-of-limitations grounds and the Majeski plaintiffs' motion to amend their complaint. As explained below, the court grants the former and denies the latter, and dismisses the Majeski case.

**3.** The Affidavit of Wendy Harris is Exhibit 3 in Volume II of the Appendix to Defendants' Memo-randum in Support of Motion for Summary Judgment in the Eckstein Action.

### 1. The Motion for Summary Judgment Against the Majeski Class

A court must decide a case on summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the objecting party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). When making factual findings under Rule 56, the court draws all reasonable inferences from the record in favor of the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989). In the following subsections, this court finds, as a matter of law, that the Majeski plaintiffs are retroactively subject to a one-and-three-year statute of limitations, and that, as a matter of law, that limitations period ran before the Majeski plaintiffs filed their lawsuit.

### a. The Applicable Statute of Limitations for the Majeski Plaintiffs

In October of 1988, when the Majeski plaintiffs filed their case, courts in the Seventh Circuit looked to state blue sky laws in order to determine the applicable limitations period for securities suits brought under § 10(b) and Rule 10b–5. That meant that federal district courts in Wisconsin applied a Wisconsin limitations period to a case arising in Wisconsin. That period barred cases brought more than three years from the date of sale. Wis.Stat. § 551.59. The Majeski plaintiffs satisfied the three-year limitations period in place in Wisconsin when the Majeski case was filed. *Eckstein*, 8 F.3d at 1128. Unfortunately—for the Majeski plaintiffs at any rate—the journey through limitations law merely begins with that conclusion.

On July 30, 1990, the Seventh Circuit decided *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir.1990), *cert. denied*, 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991) ("*Short* "). In *Short*, the Seventh Circuit changed its practice of consulting state blue sky statutes to determine the statute of limitations for actions brought under § 10(b) and Rule 10b–5. Instead, the Seventh Circuit held that § 13 of the Securities Act of 1933 provides the statute of limitations for actions under § 10(b) and Rule 10b–5. That statute provides:

> No action shall be maintained to enforce any liability ... unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created ... more than three years after the sale.

*Short* at 1390. Thus, the Seventh Circuit held in *Short* that the applicable statute of limitations for § 10(b) claims was one year from the date the plaintiffs knew or should have known of the violation, but no more than three years from date of violation. If courts were to apply this new law retroactively, then the Majeski action would be subject to a stringent limitations period that no one knew applied when the Majeski plaintiffs filed their suit.

The United States Supreme Court appeared next in the parade of limitations lawmakers. On June 20, 1991, the Supreme Court decided *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) ("*Lampf*"), in which the Court agreed in principle with *Short*, although it applied § 9(e) of the Act, 15 U.S.C. § 78i(e), as the most appropriate basis for the one-year/three-year rule announced in *Short*.

In reaction to *Lampf*, and to its apparently fully retroactive effect, Congress and the President enacted § 27A on December 20, 1991. That law announced that for 10(b) actions commenced before June 20, 1991 (when *Lampf* was decided), courts were to apply the limitations laws applicable in the jurisdiction on June 19, 1991, including the principles of retroactivity applying on that day. For the Majeski plaintiffs, who filed in 1988, § 27A meant that the Seventh Circuit's 1990 decision in *Short*—the one-year/three-

year period—applied if the rules of retroactivity in the Seventh Circuit on June 19, 1991 said so.

On March 11, 1992, this court ruled that *Short* applied retroactively to the Majeski plaintiffs because the Supreme Court held in 1991 that a decision is retroactive if the court making the decision applies it to the litigants in that case, and because the *Short* court had applied the new limitations rule to the litigants in that case. *See James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991); *Majeski,* 786 F.Supp. at 1462. However, five months after this court reached that conclusion, the Seventh Circuit held, in *McCool v. Strata Oil Co.,* 972 F.2d 1452 (7th Cir.1992), that *Beam* had made *new* law (i.e., post-*Lampf* law) and that the law of retroactivity which was in place on June 19, 1991, came from *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92. S.Ct. 349, 30 L.Ed.2d 296 (1971) instead. Thus, under § 27A, the appeals court remanded this case to this court to apply the law of *Chevron* to determine whether or not *Short* applies retroactively to the Majeski plaintiffs. *Eckstein,* 8 F.3d 1121.

In addition to finding that *Chevron* was the law in June of 1991, the appeals court also determined that *Chevron*'s analysis comes down to one question: *if the plaintiff relied on the pre-Short period of limitations, then Short does not apply retroactively. McCool,* 972 F.2d at 1459; *Eckstein,* 8 F.3d at 1128. The Seventh Circuit has set forth the dispositive issue of reliance as follows: *"[I]f the plaintiffs had known that Short would apply to their claim, could and would they have filed within the period of limitations?" Eckstein,* 8 F.3d at 1129 (emphasis added). More recently, the appeals court further defined the test as

> "Reliance" must mean some act or omission that causes an investor who *could* have sued within the one-and-three-year period provided by federal law to wait until after that time has expired.

*Lewis v. Long Grove Trading Company,* 13 F.3d 1028, 1030 (7th Cir.1994) (emphasis in original).

The task of determining whether or not reliance exists is simplified somewhat by the fact that the parties have failed to raise issues on certain parts of the analysis. First, the defendants have not argued that the Majeski plaintiffs failed to sue within the three-year maximum limitations period. Thus, the court need only concentrate on whether, if the Majeski plaintiffs knew that they had to sue within one year of discovering the fraud in order to sue in the Seventh Circuit, they would have done something different so as to meet that limitations period, or to avoid it by filing elsewhere. On the other side, the Majeski plaintiffs have not presented any evidence that they would have filed in this court sooner than they did had they known *Short*'s one-year prong applied. This makes sense, for the Majeski plaintiffs claim that they only began to discover their fraud claims in the summer of 1988. Thus, the court need only consider whether the Majeski plaintiffs would have and could have avoided *Short* by bringing their case somewhere outside of the Seventh Circuit. *See Eckstein,* 8 F.3d at 1129 (proof that the plaintiffs would have and could have filed in another forum, had they known that *Short* was the law in this forum, establishes reliance under *Chevron* and beats retroactivity).

The Majeski plaintiffs' strongest assertion of reliance is that they would have filed in California federal district court instead of this court had they known that the *Short* limitations period applied and not the Wisconsin three-year statute. The Majeski class members argue that had they filed in California, the California court would have applied the Wisconsin three-year statute of limitations, and that therefore *Short* does not apply to them retroactively (i.e., the Wisconsin statute of limitations applies and they get to go forward with their case).

However, based upon the Seventh Circuit's analysis, this court finds that the Majeski plaintiffs have failed to show that they relied upon Wisconsin's three year period by filing in Wisconsin federal district court instead of California federal court. They cannot have relied, because even if the Majeski plaintiffs *would* have sued in California had they known *Short* applied, they *could not* have avoided the application of *Short* by filing in

California.[4] This conclusion is based upon two facts. First, the Seventh Circuit required that this court assume that *Short* was the law when the Majeski plaintiffs filed their suit. Thus, this court must ask whether or not the Majeski plaintiffs could have escaped *Short* (or a similarly stringent limitations period) by filing elsewhere. The plaintiffs concede, and this court finds, that the instructions of the Seventh Circuit require that this court assume that the California federal court and all of the litigants, not just the plaintiffs, would have been aware that *Short* was the law in the Seventh Circuit.

Second, the Majeski cause of action arose in Wisconsin.[5] Both parties agree that when determining the statute of limitations applicable to a federal statutory cause of action, where a federal statute fails to provide that limitations period, a federal court must look to the law of the state in which it sits, *including* the "borrowing" statute of that state. *Cope v. Anderson,* 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947). California's borrowing statute says:

> When a cause of action has arisen in another state, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this state. . . .

CCP § 361. Thus, the California federal court would have been obligated to look to the statute of limitations applicable to the federal securities claims brought in Wisconsin had the Majeski plaintiffs filed in California.

The Majeski plaintiffs maintain that the California court would have applied the Wisconsin blue sky law of three years instead of the Seventh Circuit law of *Short.* They base this rather implausible argument upon two points. First, they contend that the fact that the California borrowing statute only discusses the law of the "state" (i.e., Wisconsin) rather than the applicable federal law in the jurisdiction means that the federal courts of California would have only been allowed to apply an outdated state blue sky law to a § 10(b) action instead of the relevant federal law of the jurisdiction. This court finds it inconceivable that a California federal court would have read the borrowing statute so narrowly and with such disdain for the laws of federalism. Instead, this court finds that a California court would have applied the *Short* limitations period when a federal court sitting in Wisconsin (the state in which the action arose) would have been obligated to apply that period to the case had it been filed in Wisconsin. *See Ceres Partners v. GEL Assoc.,* 918 F.2d 349, 352 (2nd Cir.1990), *aff'g* 714 F.Supp. 679.

The second argument advanced by the Majeski plaintiffs is that at least one case in the Ninth Circuit indicates that when choosing among statutes of limitations for federal claims without limitations periods, the federal court need not look to the California borrowing statute, but need only look directly to the state law of the state most connected with the federal claim. *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir.1981). This principle merely restates the fact that a federal court must look to the relevant law in the state where the cause of action arose. Here, everyone agrees that was Wisconsin. The court finds that a California court would have determined, in 1988, that when a relevant federal statute of limitations existed which bound the federal courts in the state in which the case arose, the California court would have to apply that federal statute of limita-

---

4. For purposes of this analysis only, the court shall assume that the Majeski plaintiffs *would* have filed in the Ninth Circuit to try to escape the application of *Short.* The defendants make a strong argument that the Majeski plaintiffs, all of whom reside in Wisconsin and who bought their interests from Wisconsin brokers, would have filed in Wisconsin even if they had known that *Short* was the law in the Seventh Circuit, for the Majeski plaintiffs assert that they were not put on discovery notice until the summer of 1988, and thus assert that they had until the summer of 1989 to beat *Short.* Perhaps, under these circumstances, they would not have chosen to file outside of the Seventh Circuit in October of 1988. However, the court shall not make a finding of law on this matter, for it finds that the Majeski plaintiffs could not have avoided *Short* even if they would have filed in the Ninth Circuit.

5. The plaintiffs have failed to argue otherwise, and the court finds no reason to question this conclusion.

tions, rather than any formerly relevant state blue sky law. *See Sierra Club v. Chevron U.S.A., Inc.,* 834 F.2d 1517, 1521 (9th Cir. 1987) ("a state statute of limitations should only be applied in the absence of a relevant federal statute of limitations").

This court therefore finds that, under the Seventh Circuit's scenario, a California court would have applied *Short,* and not the Wisconsin blue sky laws, to a Majeski action filed in the California federal courts. Thus, the answer to the question of whether or not the Majeski plaintiffs would have or could have filed in California and avoided *Short* had they known *Short* was the law of the Seventh Circuit is "no."

Nor have the Majeski plaintiffs met their burden of showing reliance by failing to file in any *other* forum—state or federal—which would have offered a preferable limitations period. There is a dearth of evidence to support such a claim. Counsel for the Majeski plaintiffs emphasized in his affidavit that he would have filed in California federal court had he known that *Short* was the law in the Seventh Circuit. (Kersten Aff. ¶ 4.[6]) The court shall take counsel at his word on this summary judgment motion against his clients.

Because the court finds that the Majeski plaintiffs could not have avoided *Short* by filing in California, and because the court finds that the Majeski plaintiffs have failed to raise a material issue of fact that they would have filed their claims in any forum other than the Wisconsin or California federal courts, even if they had known *Short* was the law in the Seventh Circuit, the Majeski plaintiffs have failed to show that they relied on the pre-*Short* limitations period by filing here instead of somewhere else.

■ Finally, the court finds that the fact that the Majeski plaintiffs have expended considerable resources in pursuing this case in this forum cannot suffice, without more, to prove reliance under *Short.* The court recognizes the potential harshness of applying a shortened statute of limitations retroactively

to bar a claim. No doubt even with the relief offered by reliance rules, plaintiffs often suffer regrettable losses. But under the laws of retroactivity bestowed upon us, this court cannot find that economic expenditure alone establishes reliance.

The Majeski plaintiffs have not proven reliance under the collapsed *Chevron* analysis defined in *McCool, Lewis,* and *Eckstein.* Therefore, *Short* applies retroactively to the Majeski plaintiffs. The court turns now to the question of whether the Majeski plaintiffs are time-barred under *Short.*

### b. Are the Majeski Plaintiffs Time–Barred Under *Short* ?

As discussed above, the Seventh Circuit remanded because this court did not apply the reliance (*Chevron* ) analysis in finding that *Short* applied. The appeals court was silent on the issue of whether or not this court properly found that, if *Short does* apply, the one-year-from-notice limitations period bars the Majeski plaintiffs as a matter of law. That is what this court must decide now.

■ In its decision prior to remand, this court found that the Majeski plaintiffs were on notice of the fraud no later than August of 1987, when they had all received the interim report of May 1987 which put them on notice that the movies had done poorly and no more would be made, and yet the plaintiffs failed to exercise reasonable diligence in pursuing their duty to inquire. Thus, this court found that the one-year prong of *Short* ran out no later than August of 1988, and that the Majeski plaintiffs were time-barred because they did not file their claim until October of 1988. The defendants argue that this court need not revisit this *Short* analysis in light of the appellate decision to remand. However, the court finds that its previous decision failed to address two major and a few minor points illuminated by the Seventh Circuit decision, and shall make findings on those points now.

This court's earlier decision found that the Majeski plaintiffs' claim that the prospectus and offering materials portrayed an overly

---

**6.** The Affidavit of George Kersten is Exhibit A to the Majeski plaintiffs' countermotion to strike

limitations period defenses.

rosy picture of the investment and fraudulently misrepresented its risks should have been brought no later than August of 1988. The court remains of that opinion for the reasons stated in its previous opinion. Therefore, the "safe and conservative" claim is time-barred. However, the Seventh Circuit focused on two other bases for fraud claims—two facts which the Majeski plaintiffs allege were fraudulently omitted from the October 1985 Supplement.

### (1) New World Litigation

■ First, the Majeski plaintiffs allege that the defendants fraudulently failed to disclose the fact that New World was in perilous financial straits. The major problem was that a principal safety feature employed in the BFI offering materials—presales of movies to ancillary markets—was substantially lost because the buyer in the pre-sale contract for worldwide television (Worldvision) refused to accept New World's movies because they were too "lousy" to show on television. New World and Worldvision had been in a dispute since at least September of 1985, and allegedly this dispute severely threatened the financial health and security of New World, and therefore of the BFI partnership. In December 1985, New World sued Worldvision for breach of contract, and Worldvision counterclaimed. The companies eventually settled the disputes by cancelling the contracts and returning to Worldvision all sums Worldvision had previously advanced to New World. (Majeski Pls. Ex. 10.)

Although the October 1985 Supplement to the prospectus failed to mention these allegedly critical facts, BFI disclosed the controversy in February 1986, by mailing to all investors (and filing with the SEC) a Form 8–K which explained that the controversy might have a negative impact on BFI's financial health and on New World's ability to borrow from its principal lender, Chemical Bank (receivables from Worldvision contracts were allegedly between 40% to 50% of New World's collateral for credit).[7] In the February report, BFI stated:

New World had agreements with Worldvision Enterprises, Inc. ("Worldvision Agreements") pursuant to which New World had granted to Worldvision certain television distribution rights in, among other things, all theatrical motion pictures distributed by New World including Partnership Pictures ("Pictures"). Worldvision has ceased making payments to New World under the Worldvision Agreements, claiming that New World has not performed its obligations under such Agreements. *Accordingly, New World, as plaintiff, filed a complaint, which was amended on December 18, 1985, in the Superior Court of the State of California against Worldvision....* The complaint seeks principally to (i) terminate the Worldvision Agreements and (ii) obtain damages as a result of defendants' failure to make payments allegedly required under, and other alleged breaches of, the Worldvision Agreements. Because New World believes the Worldvision Agreements have been breached by the defendants and are therefore terminated, New World has commenced the licensing and distribution of Pictures and motion pictures and television properties of third parties.

The resolution of this controversy will affect worldwide television syndication rights in all the Pictures which have been acquired to date and will be acquired in the future.... [T]he risk reduction benefits of preselling [worldwide television] rights will not be available to the Partnership.... The controversy regarding whether Worldvision or New World has television syndication rights in Pictures may delay or diminish the Partnership's ability to generate Gross Receipts....

There can be no assurance that New World's distribution operations will generate the revenues that would have been generated by the Worldvision Agreements had they not been terminated by New World. In addition, the Worldvision Agreements provided a source of Presales that formed part of New World's borrowing base with Chemical Bank.... [T]he

---

7. A copy of the Form 8–K is attached as Exhibit "A" to the March 2, 1994 Mandel Reply Affidavit.

*See also* BFI's first quarter 1986 report to investors, *Id.*, Ex. B.

termination of the Worldvision Agreements and the loss of that borrowing base would have an adverse impact on New World's ability to borrow from Chemical Bank.

(See Mar. 2, 1994 Mandel Aff., Ex. A. (emphasis added).) This report was mailed to investors in February of 1986.

The court finds that this report put the investors on inquiry notice of the dispute and litigation between New World and Worldvision.[8] Had the investors bothered to look into the public records, they would have discovered from the complaint and cross-claim that the dispute had been broiling for months. The fact that the report failed to mention that Worldvision had cross-claimed on December 29, 1985, does not delay the beginning of the one-year limitations period, for inquiry notice requires this court to charge the Majeski plaintiffs with all knowledge that a reasonable investor conducting a diligent investigation starting in February of 1986 would have obtained. The court finds, as a matter of law, that a reasonable investor would have discovered that Worldvision had cross-claimed, and would have discovered the basis for the dispute.[9]

The court also finds that any claims that the Majeski plaintiffs have regarding omissions of the fact that New World's loans were financed through pre-sales and that Chemical Bank might refuse further credit because of the loss of Worldvision revenue began to accrue as of receipt of the February report. The last paragraph of that report, quoted above, would put a reasonable investor on inquiry notice of those claims. Further, the Majeski plaintiffs need not have discovered the entire alleged "scam" to trigger the one-year filing period, for that period "[does] not await [plaintiffs'] leisurely discovery of the full details of the alleged scheme." *Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir.1974) (quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970)).

### (2) Home Video Receipts

■ Second, the Majeski plaintiffs assert that the prospectus fraudulently omitted the fact that only 22.5% of the royalties from home videos would go to BFI, and that the rest would remain with New World. The Majeski plaintiffs do not allege that the registration statement, with the production agreement attached, is fraudulent with respect to home video receipts, for the production agreement fully reveals the proportions of the split. Nor do they dispute the fact that the production agreement was available for free on demand, and that the prospectus adequately informed the investors of this fact. Instead, the Majeski plaintiffs argue that the omission in the prospectus was material and that the court should not find, as a matter of law, that all investors are put on notice of all information contained in documents which are a part of a registration statement, and incorporated by reference in the prospectus. The Majeski defendants counter that even if the specific terms of the split of the home video receipt distribution were material, the terms were not omitted from the prospectus because the registration statement contained the details, and the investors were put on inquiry notice of the terms of the production agreement as soon as they read their prospectuses. The court agrees.

The Seventh Circuit decision on appeal in this case found that "[o]nly the registration

---

8. The fact of the lawsuit was public knowledge and in the press even before February, 1986, for New World issued a press release announcing its litigation on December 18, 1985. (*See* 12/18/85 Press Release, 12/18/85 Business Wire, 12/19/85 *Daily Variety* Article, Hennessy Aff., Appendix to Defendants' Memorandum in Support of Motion for Summary Judgment in the Eckstein Matter, Vol. II, Ex. 1–K.)

9. Worldvision's cross-claim stated, *inter alia:*
[The New World defendants] in 1985 have delivered cassettes of the first group of theatrical motion pictures to Worldvision pursuant to the Theatrical Motion Picture Agreement. With minor exceptions, the motion pictures delivered by [New World defendants] are not suitable for exhibition over U.S. free television networks and stations, do not meet U.S. network standards and quality, contain excessive nudity, gratuitous violence, and obscene language to such an overwhelming extent that they are completely unacceptable for U.S. free television exhibition.
(Hennessy Aff., App. to Defs.' Mem. in Supp. of Mot. for Summ.J. in the Eckstein Matter, Vol. II, Ex. 1–I (part two) at 4–5.)

statement need be self-contained. A prospectus is a subset of the information contained in the registration statement." *Eckstein,* 8 F.3d at 1131. The court finds, as a matter of law, that a reasonable investor in the position of the Majeski plaintiffs must be imputed with knowledge of the relevant portions of the registration statement. *See Block v. First Blood Assocs.,* 988 F.2d 344, 348–49 (2d Cir.1993); *Landy v. Mitchell, Petroleum Technology Corp.,* 734 F.Supp. 608, 617–18 (S.D.N.Y.1990); *accord White v. Melton,* 757 F.Supp. 267 (S.D.N.Y.1991) (information contained in a statement of additional information which was available upon request and at no charge imputed to investors). Even if there is no general rule of imputing information contained in the registration statement to an investor, the court finds that the Majeski plaintiffs should have obtained the agreement because of its central role in the prospectus, if not upon discovering that importance (i.e., when reading the prospectus), then when they were put on inquiry notice of their other alleged claims of misrepresentation of risk and omission of the financial problems that New World encountered.

■ The Majeski plaintiffs have tossed in one final argument—that the defendants are equitably estopped from asserting the running of any limitation period prior to mid–1988 because they assured the plaintiffs that they had taken steps to expand BFI's assets and improve its performance, and had told the investors to let BFI run its course. This court finds that the plaintiffs have not met their burden of establishing from the record that they were diligent investors who would have discovered their claims before the one-year limitations period ran but for the active fraudulent concealment of the defendants. *See Davidson v. Wilson,* 973 F.2d 1391, 1402 (8th Cir.1992); *Short,* 908 F.2d at 1391–92. Without establishing those facts, the plaintiffs have no tolling argument. The statements allegedly made by the defendants neither rise to the level of fraudulent concealment, nor overcome the fact that the investors were told about New World's litigation and potential credit difficulties, and that a 1987 report disclosed that BFI's movie business had failed to perform, that no more movies would be made, and that the project-

ed loss was at more than $14 million. *See Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1416 (9th Cir.1987); *Cf. Eckstein,* 8 F.3d at 1131 (the Majeski plaintiffs cannot assert that they relied upon fraudulent supplemental literature if they already possessed information, from the prospectus or elsewhere, which called a representation into question). When a document would give rise to a suspicion in a reasonable investor that a fraudulent omission or misrepresentation had occurred, then other statements or letters to investors do not lift the duty of inquiry off the back of the investor. The statements by the defendants do not toll the statute of limitations for the Majeski plaintiffs.

Thus, the court finds that the Majeski plaintiffs have failed to raise a material dispute of fact that would push the date of inquiry notice back from August of 1987. Therefore, the Majeski plaintiffs' claims, filed more than one year from that date, are time-barred and the court shall grant the defendants' summary judgment motion.

### 2. The Majeski Plaintiffs' Motion to Amend Their Complaint

■ The Majeski plaintiffs have asked this court to allow them to amend their complaint to add a RICO claim. Rule 15 of the Federal Rules of Civil Procedure gives courts discretion to allow amendments to pleadings, and states that leave to amend "shall be freely given when justice so requires." However, the privilege is not absolute, and a court may deny a motion to amend where there has been undue delay or there would be undue prejudice to the opposing party, or when the amendment would be futile. *Wade v. Hopper,* 993 F.2d 1246, 1249 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 193, 126 L.Ed.2d 151 (1993) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). In this case, all of the reasons for denying the motion apply. The proposed RICO claims are futile because: (1) they are based, in part, upon the doomed § 10(b) and Rule 10b–5 claims dismissed in Section II(A)(1); and (2) they are barred by the four-year statute of limitations for RICO and are not saved by relating back to the original complaint. *See Johnson v. Artim*

*Trans. Sys., Inc.*, 826 F.2d 538, 547 (7th Cir.1987), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988) (complaint must give fair notice of the general fact situation out of which the claim arises in order for the added claim to relate back); *Patterson v. General Motors Corp.*, 631 F.2d 476, 486 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981) (essence of the relation back doctrine is that the defendants must have had warning of the conduct which they would have to defend). Further, the plaintiffs have delayed unduly in bringing these claims, for the proposed addition came after this case had been in this court for three years and in litigation for five years, and after the Seventh Circuit's narrow mandate on the securities fraud claims before this court. Therefore, the Majeski plaintiffs' motion to add a RICO claim is denied.

### 3. Pendant State Law Claims

In section II(A)(1) above, this court dismissed the § 10(b) and Rule 10b–5 claims, which are the only federal claims which have survived the Majeski proceedings to date. In section II(A)(2) above, the court denied the Majeski motion to add a new federal claims under the RICO statute. With no federal claims remaining in this case, the court shall also relinquish its pendent claim jurisdiction, and dismiss the Majeski action.

### B. THE ECKSTEIN ACTION

The defendants to the Eckstein action have moved this court for summary judgment against the Eckstein class, on the merits and on statute of limitations grounds. The Eckstein plaintiffs have failed to set forth a genuine issue of fact supporting their case on the merits, and for that reason, this court shall dismiss the Eckstein matter on summary judgment.[10]

■ The defining characteristic of Eckstein class members is their failure to read the public offering materials. The Seventh Circuit set forth the Eckstein theory of causation as follows: Because the Eckstein class did not read the prospectus, their task is to

establish the counterfactual proposition that if the entire universe of information had been available to the BFI investors, BFI would not have met the $35 million minimum of the second offering, because more careful investors would not have invested and the partnership offering could not have closed. *Eckstein,* 8 F.3d at 1129.

BFI attracted $48 million in subscriptions. The minimum amount necessary to close the deal was $35 million. In their proposed findings of fact, affidavits, and memorandum in support of their opposition to the defendants' motion for summary judgment, the Eckstein plaintiffs have not set forth a scintilla of evidence that $13 million worth of Interest subscriptions would not have been bought had the investors who read the prospectus known about the Worldvision dispute or any other allegedly material fact omitted. In fact, the Eckstein plaintiffs have filed no affidavits from investors who relied on the prospectus or supplements in buying subscriptions. The two individual Eckstein plaintiffs themselves have filed affidavits, and now allege that they "reviewed" the prospectus and invested $5000, and would not have risked that money had they known the facts allegedly omitted. These affidavits have no probative value as to the critical universe of investors who read the prospectus, because the Eckstein plaintiffs have, all along, alleged that they and the class represent those investors who purchased interests "without relying on any of the public offering materials." (Eckstein Am.Compl. ¶ 41.) Further, even if the two individual Eckstein plaintiffs' affidavits were not directly in conflict with the allegations forming the basis of their complaint, and thus set forth a material dispute over whether or not the Eckstein individuals read the prospectus and would not have bought BFI interests had, for instance, the Worldvision dispute been disclosed in the 1985 Supplement, these affidavits provide no objective evidence that those investors whose investment decisions are at issue (i.e., those who relied on the public offering material) agreed with the individual Ecksteins. *See Milton v. Van Dorn Co.,* 961 F.2d 965, 970–72 (1st Cir.1992) (objective determination of

---

10. Because the court dismisses this action on the merits, it need not resolve the question of whether or not the Eckstein plaintiffs filed before the California three-year limitation period ran.

materiality requires assessment of inferences a reasonable investor would draw).

Thus, even if this court assumes the failure to disclose New World's dispute with Worldvision (such as it was in October of 1985 before the Worldvision/New World lawsuit was filed), and even if this court accepted the fact that the two Eckstein individuals relied, the Ecksteins have failed to come forward with evidence that the supplemental offering would have failed but for the fraud in the materials issued before investors subscribed in $35 million of Interests and the investments became a "done deal."

This court has no choice but to enter summary judgment against plaintiffs who fail to meet their burden of establishing facts from which a reasonable trier of fact could find for them on an issue which would be their burden to prove at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 325, 106 S.Ct. 2548, 2552–53, 2553–54, 91 L.Ed.2d 265 (1986); *Essex Ins. Co. v. Stage 2*, 14 F.3d 1178, 1181 (7th Cir.1994); *Porter v. Whitehall Lab.*, 9 F.3d 607, 612 (7th Cir.1993). This case is long past the pleading stage, and the *Eckstein* class must do far more "than simply show that there is some metaphysical doubt as to the material facts" in order to defeat defendants' summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The Eckstein plaintiffs have failed to produce credible evidence that the defendants committed fraud on investors who read their offering materials and that had that fraud not occurred, the deal would not have closed. Because the Eckstein plaintiffs have not provided evidence supporting their "counterfactual proposition about the decision-making of thousands of investors," this court must dismiss their case on the merits. *See Eckstein*, 8 F.3d at 1131.

### III.   CONCLUSION

For all of the foregoing reasons:

**IT IS THEREFORE ORDERED** that the motion for summary judgment brought by the defendants in the above-captioned Majeski matter is GRANTED and the Majeski case is dismissed with prejudice.

**IT IS FURTHER ORDERED** that the Majeski plaintiffs' motion to amend their first amended complaint is DENIED.

**IT IS FURTHER ORDERED** that the motion for summary judgment brought by the defendants in the above-captioned Eckstein matter is GRANTED and the Eckstein case is dismissed with prejudice.